UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| WADE K. JENSEN, as trustee of the DeAnna W. Jensen Living Trust dated January 26, 2012, and any amendments thereto; DAN KENSINGER; RAYMOND SHERMAN, trustee of the Raymond Sherman Trust, and any amendments thereto; STEVEN STOKESBARY; STEVE MEYER; GRANT SHUMAKER; THOMAS KENNY; TOM JACOBSON; ELISABETH NOEL, as trustee of the Elisabeth J. Noel Trust, and any amendments thereto; SARAH POWELL; RYAN MEIS; and MATTHEW JOHNSON, <br><br> Plaintiffs, <br><br> vs. <br><br> WAYNE THOMPSON; MICHAEL HURLBURT; DANIEL RISSING; DANIEL NEWELL, <br><br> Defendants. | Case No: 17-CV-4014-LLP <br><br><br> MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS, DOC. 26 & 28 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending before the Court is Defendants Wayne Thompson, Michael Hurlburt, and Daniel Rissing's (Management Defendants) Motion to Dismiss, Doc. 26, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. In their motion, Management Defendants ask that the federal security claims be dismissed for several reasons, including: 1) the claims are barred by the statute of limitations; 2) the complaint fails to meet the heightened pleading standards required under the Private Securities Litigation Reform Act (PSLRA) and Rule 9(b) of the Federal Rules of Civil Procedure; and 3) the complaint fails to raise a strong inference of scienter, show materiality of the alleged misrepresentations or omissions, or adequately allege reliance or loss causation. Additionally, Management Defendants ask that the state law claims be dismissed as they 1) necessarily rely on supplemental jurisdiction, which would be lacking should the motion to dismiss the federal securities claims be granted, and 2) are also inadequately pled as they do not meet the standards of Rule 9(b). Management Defendants also

1

assert that South Dakota law does recognize claims for "Fraud in Relation to a Contract" and that they did not contract with the Plaintiffs, a necessary requirement of the cause of action for Fraud in Relation to Contract under S.D. Code § 53-4-5. Finally, Management Defendants argue that the claim for Breach of State-Law Fiduciary Duty is a derivative action and the necessary procedural prerequisites for bringing a derivative action in federal court have not been met. For the following reasons, Management Defendants' motion is granted in part and denied in part.

Also pending before the Court is Defendant Daniel Newell's Motion to Dismiss, Doc. 28. With the exception of Count I, Plaintiffs complaint alleges all of the same causes of action against Defendant Newell. Similarly, for the reasons below, Defendant Newell's motion is granted in part and denied in part.

## BACKGROUND

Accepting Plaintiffs' allegations as true and giving Plaintiffs the benefit of all reasonable inferences, the Court lays out the following facts in accordance with the pleadings. *See Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995) (providing the standard for granting a motion to dismiss under Rule 12(b)(6)). Plaintiffs—eleven physicians and one widow of a deceased physician—allege they were defrauded by Defendants, who are managers and/or directors of non-party Progressive Acute Care, LLC (PAC), when Defendants solicited the Physicians' investment in PAC by misrepresenting or omitting material information regarding historical and projected financial performance of the investment. PAC was founded in 2008 under the laws of the state of South Carolina and engages in the for-profit acquisition and management of rural hospitals. PAC is managed by three individuals, the Management Defendants—Thompson as Chief Financial Officer, Hurlburt as Chief Operating Officer, and Rissing as Chief Executive Officer. Each of the Management Defendants also sits on PAC's Board of Directors along with Defendant Newell. Newell is a licensed CPA and was a member of PAC's Audit Committee at all times during the relevant period.

In 2009, PAC acquired and began operating three rural hospitals in central Louisiana, thanks in part to the investments of Plaintiffs and others. Sometime around late 2012 to early 2013, Management Defendants suggested that PAC purchase a fourth hospital—Dauterive Hospital (Dauterive). Defendants solicited additional capital from the Plaintiffs for this investment through a private placement memorandum (PPM) and in-person meetings. An in-person meeting took place in Dakota Dunes, South Dakota in February of 2013, where

Management Defendants "walked [Plaintiffs] through key parts of the PPM. Defendant Newell was evidently not present at this meeting. In April 2013, Plaintiffs were presented with the PPM itself, which also contains a Due Diligence Report, dated February 8, 2013, which purportedly discussed the historical performance of Dauterive. The PPM contained a table which purports to "[set] forth the summary historical financial information" of Dauterive for the fiscal years ended December 31, 2011 and 2012. Doc. 32-1 at 75. The PPM states that the information "was derived from Dauterive Hospital's internal unaudited financial statements which were prepared by the seller and are not reflective or in accordance with generally accepted accounting principles (GAAP)". *Id.* "Therefore," the PPM advised, "this unaudited historical financial information may differ materially and completely from GAAP and may be substantially incomplete for your purposes in evaluating Dauterive Hospital's financial results." *Id.* According to the provided information, Dauterive's net income with interest, taxes, depreciation, and amortization (EBITDA) was $3.72 million in 2011 and $2.434 million in 2012. *Id.*

The next section of the PPM is entitled "Projected Pro Forma Financial Information" and contains a summary of a four year projection for fiscal years 2013–2016. *Id.* at 76. The projections were prepared "based solely upon our analysis and on the assumptions…listed related to revenues, expenses, and other factors." *Id.* The PPM states that its authors had not "verified or confirmed the reasonableness of the assumptions contained in the projections" and lists a total of eleven assumptions the financial projects are based on. *Id.* The projected EBITDA for 2013 was $4.131 million, $9.169 million in 2014, $9.625 million in 2015, and $8.122 million in 2016. *Id.* at 77. Finally, the PPM contains a lengthy description of risk factors associated with the acquisition, including risks that accompany running a business in the healthcare industry, government regulations and taxes that may impact the business, problems with deriving financial projections from unaudited information prepared by the seller, and the fact that PAC's accounting department had yet to operate in a company as large as PAC would become after the potential Dauterive acquisition. *Id.* at 84–119.

Plaintiffs state in their complaint that Plaintiffs agreed to invest the $3 million in equity required for PAC to complete the Dauterive acquisition following the February 2013 in-person meeting in Dakota Dunes. The final version of the PPM was dated April 8, 2013 and stated that the signed participation agreement and check had to be returned by April 22, 2013. The signed participation agreements that were dated all had dates after April 8, 2013. In return for their

3

investment, they received a number of Series B Preferred Units in proportion to their existing equity ownership of PAC. It is uncontested that these Series B Preferred Units and their exchange fall under the Securities Exchange Act of 1934. Plaintiffs also approved the Management Defendants obtaining financing for the remainder of the $15 million purchase price with bank debt. Plaintiffs were also promised that each of the Management Defendants would enter into a $1 million personal guarantee for the bank loan. Plaintiffs maintain these guarantees were illusory.

PAC formally agreed to purchase Dauterive in May 2013. Following the Dauterive acquisition, the PAC Board of Directors increased the Management Defendants' compensation to $400,000 annually, along with short-term incentive compensation of up to 100% of the base salary. Management Defendants were also entitled to 25% of the cash distributions if the 3-year average EBITDA fell between $0-$3.39 million and could obtain as much as 40% of cash distributions with an EBITDA of $19.1 million or more.

Plaintiffs "received little information regarding PAC's financial health outside of an annual investors update and/or PowerPoint presentation from the Management Defendants" but by early 2014, PAC began defaulting on its bank loans. Dauterive's cash flow from operations sunk to -$4.7 million in 2014 and -$6.1 million in 2015, a far cry from the projected EBITDA of $6 million as provided by the PPM. Though PAC's other three hospitals continued to remain profitable, Plaintiffs received information in the spring of 2016 that PAC would potentially need to file for bankruptcy.

On May 18, 2016, some of the Plaintiffs met with "some or all of the Management Defendants" and PAC's legal counsel in Dakota Dunes. Multiple Plaintiffs were unable to attend the meeting other than by proxy, which was entrusted to Management Defendant Hurlburt. Hurlburt informed the Plaintiffs "that the 'perfect storm' of factors had hit PAC and left the company insolvent." Management Defendants briefly summarized PAC's financial state, advised the Plaintiffs that were present that PAC was defaulting on payments due, and informed them that a group of emergency-room physicians had obtained a $1.2 million judgment against PAC, making time of the essence because PAC could not currently pay that judgment.

Management Defendants called for a vote, with Defendant Hurlburt casting the proxy votes for each absent member. Feeling under pressure and ill-prepared to discuss the company's financial situation due to a lack of prior information, Plaintiffs authorized the filing of the

bankruptcy. It was through the Bankruptcy process that Plaintiffs came to discover documents which they assert would have drastically altered their decision to invest in Dauterive: 1) a PAC Board internal memorandum dated January 9, 2013 in which the seller's projection of 2013 EBITDA for Dauterive was a $50,000 loss; and 2) an audit report from the accounting firm Crowe Horwath LLP which the Defendants received in April just days before releasing the finalized PPM to Plaintiffs which was harshly critical of PAC's internal financial controls. Further, Plaintiffs allege that Defendants were told by a PAC employee in December 2012 that they would not be able to obtain their projected savings related to benefits at Dauterive, which were presumably part of the assumptions made in PAC's calculations of projected future EBITDAs. In light of this information, Plaintiffs allege Defendants' projections were materially misleading because they failed to disclose material facts. Plaintiffs allege that they relied on these material misrepresentations in deciding to invest in PAC, which ultimately resulted in a total loss of their investment.

Plaintiffs now seek damages for violations of securities laws, fraudulent and negligent misrepresentations and omissions, and breaches of fiduciary duty. Specifically, Plaintiffs allege that Defendants Wayne Thompson, Michael Hurlburt, and Daniel Rissing (Management Defendants) violated § 10(b) of the Securities Exchange Act (SEA) and Rule 10b-5. Further, Plaintiffs allege that all Defendants, Defendant Daniel Newell and the Management Defendants: 1) violated § 20(a) of the SEA; 2) engaged in deceit in contravention to S.D. Code § 20-10-1; 3) committed actual fraud in relation to contract in violation of S.D. Code § 53-4-5; 4) committed constructive fraud in relation to contract under S.D. Code § 53-4-6; 5) engaged in common law fraud; 6) made negligent misrepresentations; and 7) breached their state law fiduciary duties.

## DISCUSSION

### I.     Rule 12(b)

As a preliminary matter, the Court must address the Plaintiffs' assertion that the Court must not consider the documents attached to Defendants' briefs in support of their respective motions to dismiss. Management Defendants attached numerous documents to their Memorandum in Support of Their Motion to Dismiss including: 1) the Private Placement Memorandum (PPM) dated April 8, 2013 which itself contains multiple appendices, such as the "Dauterive Due Diligence Report" (DDR) dated February 8, 2013; 2) a table purporting to point out cautionary language provided to Plaintiffs in the PPM and the DDR; 3) a 2013 Monthly

Budget Report updated January 9, 2013; 4) an April 5, 2013 letter from Crowe Horwath LLP reporting the results of an audit of financial statements of PAC; 5) a PAC "Annual Investor Update" for fiscal year 2013 dated January 20, 2014; 6) a PAC Investor Update: 2013 Final Audit, dated July 2014; and 7) Subscription Agreements signed by the Plaintiffs to purchase Series B preferred Units of PAC to fund the Dauterive acquisition. Defendant Newell attached also attached a copies of the PPM, 2013 Budget Report, Crowe Horwath Letter, and July 2014 Investor Update.

In response, Plaintiffs submitted by declaration portions of the "PAC Offering Packet" which includes "Consent Minutes Approving Transaction and Second Amended and Related Operating Agreement," an "Exercise Notice and Subscription Agreement," and what appears to be a more complete version of the PPM and its appendices. Stating that they would not "admit the authenticity of the edited documents Defendants attached to their briefs, Plaintiffs argue that considering the documents presented by Management Defendants would be inappropriate because they improperly contradict the complaint, are facially incomplete, and have not been tested in discovery. Management Defendants assert that the Court can "incorporate and consider the documents referenced by Plaintiffs in their Complaint" and that "[b]y the Plaintiffs' own pleading they 'opened the door' to consideration of the Investor Updates." Management Defendants also argue that because they are not relying on the Investor Updates for the truth of their contents, they are not using the documents to contradict statements made in the complaint, but to provide evidence that the Plaintiffs received information that would have caused the statute of limitations to run. Further, and in light of Plaintiffs' challenge to the authenticity of the documents, Management Defendants attached the full and complete versions of the Investor Updates to their reply memorandum.

"If, on a motion asserting the defense numbered (6) . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment . . . and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED. R. CIV. P. 12(b). However, the Court is "not strictly limited to the four corners of the complaint" in adjudicating a Rule 12(b) motion. *Dittmer Prop., L.P. v. Fed. Deposit Ins. Corp.*, 708 F.3d 1011, 1021 (8th Cir. 2013). In addressing a motion to dismiss, "[t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record" without converting

6

the motion into a motion for summary judgment. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999); *see also Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010), *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011). As the documents attached to Management Defendants' memorandum are not matters of public record, the court must determine if the materials are embraced by the pleadings themselves. Matters embraced by the pleadings include "matters incorporated by reference or integral to the claim" as well as "exhibits attached to the complaint whose authenticity is unquestioned." *Miller v. Redwood Toxicology Lab, Inc.*, 688 F.3d 928, 931 n. 3 (8th Cir. 2011) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004). "Most courts . . . view 'matters outside the pleadings' as including any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings." *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992) (quoting Wright & Miller, *Federal Practice and Procedure* § 1366). Therefore, for Management Defendants' documents to be considered on this motion to dismiss without converting the matter into a motion for summary judgment, the documents must be incorporated by reference or integral to the claim, cannot be offered either in support of or opposition to what is said in the pleadings, and their authenticity must remain unquestioned.

Case law provides for a few specific examples of documents considered on a motion to dismiss that meet these requirements. For example, a contract upon which a claim rests is a document necessarily embraced by the pleadings. *See Gorog v. Best Buy Co.*, 760 F.3d 787 (8th Cir. 2014). However, that contract must be specifically alleged, undisputed, and the sole basis of the complaint. *See BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685 (8th Cir. 2003). SEC filings have also been considered documents necessarily embraced by the pleadings when those filings are required by law and are not offered for the truth of the document's contents. *Compare Florida State Bd. of Admin. v. Green Tree*, 270 F.3d 645, 661 (8th Cir. 2001) *with Kushner v. Beverly Enters., Inc.*, 317 F.3d 820 (8th Cir. 2003).

The crux of Plaintiffs' complaint is that Management Defendants fraudulently solicited capital from the Plaintiffs to invest in a hospital. The complaint alleges that this was done "through a private placement memorandum (the 'PPM') and in-person meetings." Doc.1, para. 4. Because Plaintiffs have submitted a complete copy of the PPM within the exhibit attached to the declaration in opposition to Defendants' motion to dismiss, the authenticity of which

Management Defendants did not dispute in their reply, the Court may consider this document as its contents are alleged in the complaint. However, the Court notes that Plaintiffs' complaint alleges it was both the PPM and information presented in in-person meetings that led the Plaintiffs to invest in the hospital. The Court will also consider the Subscription Agreements attached as Exhibit G to Management Defendants memorandum, as they are the agreements Plaintiffs allege they were fraudulently induced to enter into. *See Gorog*, 760 F.3d 787 (a contract upon which a claim rests is a document necessarily embraced by the pleadings).

Plaintiffs also allege that, following the acquisition of that hospital, Plaintiffs "received little information regarding PAC's financial health outside of an annual investors update and/or PowerPoint presentation from the Management Defendants." *Id.* at para. 62. Management Defendants argue that by pleading this, Plaintiffs "opened the door" to consideration of the Investor Updates. Management Defendants also assert that consideration of the Investor Updates is proper because they are not submitted for their truth, but instead "to evidence that the Plaintiffs received information relating to the financial health of PAC in January and July 2014, and coupled with PAC's earlier bank loan default and the 'whopping projections' made in the PPM, would have caused a reasonable investor to conduct an investigation that would have discovered the alleged violation."

The Court may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions." *Kushner*, 317 F.3d at 831–32. Contrary to Management Defendants' assertions, Plaintiffs do not "open the door" to the consideration of documents on a motion to dismiss by merely pleading the existence of outside information. Plaintiffs' complaint does not state what specific documents were received by Plaintiffs following their investment, other than that there was an annual investor update. Indeed, Management Defendants have attached numerous investor updates to their memorandum, not just one. *See BJC Health Sys.*, 348 F.3d 685 (requiring a document be specifically alleged, undisputed, and the sole basis of the complaint in order to be considered on a motion to dismiss). Further, Management Defendants stated reasoning for attaching the documents is exactly what is impermissible at the motion to dismiss stage—to contradict the assertion on the face of the complaint that the action is not barred by the statute of limitations. *See Porous Media Corp.*, 186 F.3d at 1079 ("the court…may consider some materials that are part of the public record or do not contradict the complaint"); *see also Illig v. Union v. Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) ("A court may dismiss a

claim under Rule 12(b)(6) as barred by the statute of limitations if the complaint itself establishes that the claim is time-barred."). As laid out below, regardless of whether or not the Court considered the documents, which it does not, the question of when the statute of limitations began to run is a factual question that cannot be resolved on this motion to dismiss.[1]

## II.  Statute of Limitations

Plaintiffs have brought an action for fraud under § 10(b) of the Securities Exchange Act of 1934 (SEA). A complaint alleging private securities fraud is timely if filed "not later than the earlier of"—

"(1) 2 years after the discovery of the facts constituting the violation"; or

"(2) 5 years after such violation." 28 U.S.C. § 1658(b).

The complaint in this case was filed on February 10, 2017, and no one has called into doubt that it was filed within five years of the alleged violation. Therefore, the critical date for timeliness purposes is February 10, 2015—two years before this complaint was filed. In construing this limitations statute for the first time, the Supreme Court in *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010) held that "a cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first." *Merck*, 559 U.S. at 637. "[T]he 'facts constituting the violation' include the fact of scienter, 'a mental state embracing intent to deceive, manipulate, or defraud." *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12 (1976)). Applying this standard, the complaint is timely.

Plaintiffs contend that the issue of whether they were on notice is a factual question that should not be resolved on a 12(b)(6) motion.[2] Indeed, the Court recognizes that

---

[1] The question still remains as to whether or not it is permissible for this court to consider Exhibits B and C attached to Management Defendants' memorandum. However, because the Court did not find it pertinent to review those documents in order to resolve whether the motion to dismiss should be granted, the question of whether relying on those documents is permissible need not be addressed. Further, the Court did not rely on any of the documents attached to Defendant Newell's memorandum.

[2] Although Management Defendants claim to move the Court to dismiss this action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, the Court construes the motion as one to dismiss pursuant to Rule 12(b)(6) only. Bar by statute of limitation is an affirmative defense which the defendant must plead and prove, not a bar to jurisdiction which the plaintiff has the burden to establish. Compare *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008) ("the law typically treats a limitations defense as an affirmative defense that the defendant must raise . . . and that is subject to rules of forfeiture and waiver"), with *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990) ("The party seeking to establish jurisdiction has the burden of proof that jurisdiction exists."). Because none of the other reasons for dismissal set forth in Management Defendants' motion are jurisdictional in nature, the Court applies the standard of review required by Rule 12(b)(6).

> [b]ar by a statute of limitation is typically an affirmative defense, which the defendant must plead and prove. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008); FED. R. CIV. P. 8(c). A defendant does not render a complaint defective by pleading an affirmative defense, *Gomez v. Toledo*, 446 U.S. 635, 640 (1980), and therefore the possible existence of a statute of limitations defense is not ordinarily a ground for 12(b)(6) dismissal unless the complaint itself establishes the defense. *See Varner v. Peterson Farmers*, 371 F.3d 1011, 1017–18 (8th Cir. 2004) (dismissal proper because complaint ruled out tolling of statute of limitations).

*Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008); *see also Cohen v. Northwestern Growth Corp.*, 385 F. Supp. 2d 935, 945 (D.S.D. 2005) ("the issue of whether a plaintiff was on [ ] notice is 'often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)'"). Nevertheless, a motion to dismiss may be granted "in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey*, 44 F.3d at 671 (quotation marks and citations omitted).

Management Defendants claim Plaintiffs received sufficient information through their annual investor updates to put them on notice of the alleged securities violations by no later than July 2014. Relying on *Ritchey v. Horner*, 244 F.3d 635 (8th Cir. 2001) and *Great Rivers Coop. v. Farmland Indus., Inc.*, 120 F.3d 893 (8th Cir. 1997), Management Defendants argue that the investor updates contained sufficient information "to trigger Plaintiffs' responsibility to inquire further…yet they failed to exercise reasonable diligence by not seeking more information." In response, Plaintiffs assert that the "inquiry notice" standard required in *Ritchey* and *Great Rivers* was rejected by the Supreme Court in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) and by the Eighth Circuit in *Zarecor v. Morgan Keegan & Co.*, 801 F.3d 882 (8th Cir. 2015); therefore, Plaintiffs argue, Management Defendants cannot show that Plaintiffs had actual notice of the alleged fraud before February 10, 2015.

The complaint is timely if it was filed "not later than two years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b). As explained in depth in *Merck*, the term "discovery" as used in the statute "encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known." *Merck*, 559 U.S. at 648. In *Merck*, the term "inquiry notice" was used "to refer to the point at which a plaintiff possesses a quantum of information sufficiently suggestive of wrongdoing that he should conduct a further inquiry." *Id.* at 650 (international citations omitted). The Court also noted that the Eighth Circuit used the term in a "roughly similar" way. *Id.* at 650–51 (citing *Great Rivers*, 120 F.3d at 896

("Inquiry notice exists when the victim is aware of facts that would lead a reasonable person to investigation *and* consequently acquire actual knowledge of the defendant's misrepresentations." (emphasis added))). The Court, disagreed, saying:

> If the term "inquiry notice" refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other "facts constituting the violation." But the statute says that the plaintiff's claim accrues only after the "discovery" of those latter facts. Nothing in the text suggests that the limitations period can sometimes begin before "discovery can take place. . . . Because the statute contains no indication that the limitations period should occur at some earlier moment before "discovery," when a plaintiff would have begun investigation, we cannot accept Merck's argument.

*Id.* at 651. Therefore, in concluding that the "discovery" of facts that put a plaintiff on "inquiry notice" was not sufficient to begin the running of the limitations period, the Court concluded:

> [T]he limitations period in § 1658(b)(1) begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have "discovered" the facts constituting the violation"—whichever comes first. In determining the time at which "discovery" of those "facts" occurred, terms such as "inquiry notice" and "storm warnings" may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation," including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.

*Id.* at 653.

Since the *Merck* decision, the Eighth Circuit has twice discussed the issue of inquiry notice and the statute of limitations in securities fraud cases. *See generally W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 389–91 (8th Cir. 2016) *and Zarecor*, 801 F.3d at 886–87; *see also Barnes v. Oldner*, 359 F.Supp.3d 926, 933–35 (E.D. Ark. 2017). Management Defendants suggest that post-*Merck* case law is consistent with pre-*Merck* case law. This is clearly not the case. Both *Great Rivers* and *Ritchey* concluded that the statute of limitations began when the duty to exercise due diligence was triggered, *i.e.*, when the plaintiffs had inquiry notice. *See Great Rivers*, 120 F.3d at 896–99 (concluding that the statute of limitations began running shortly after information was printed in an article because the knowledge of that information would have triggered the duty to exercise due diligence which, in turn, would have resulted in actual notice); *Ritchey*, 244 F.3d at 638–41 (finding that the effect of the prior relationship with defendant on whether plaintiffs had sufficient facts beyond a level of

mere suspicion to reach a point which the victims would be incited to investigate was a factual question that could not be resolved on summary judgment). *Merck* and the Eighth Circuit's post-*Merck* case law adamantly state that inquiry notice is not enough—the statute of limitations does *not* begin to run at the point at which the duty to exercise due diligence was triggered. Instead, the statute of limitations begins at the point at which, having exercised due diligence, a reasonable plaintiff would have discovered the facts constituting the cause of action. Specifically, and contrary to Management Defendants' analysis, the *Zarecor* court provided:

> The limitations period does not begin to run when a plaintiff is put merely on "inquiry notice," or when there are "storm warnings," such that "the facts would have prompted a reasonably diligent plaintiff to *begin* investigation." Instead, the statute of limitations is triggered when the reasonably diligent plaintiff would have discovered "the facts constituting the violation" *after* an appropriate investigation."

Indeed, the Eighth Circuit found the claims in *Zarecor* to be time-barred, but it did not do so by relying on the inquiry notice standard. The mutual funds at issue had begun to decline and a class action complaint had been filed by the end of 2007. While the court determined that a reasonably diligent plaintiff would have *began* investigating at this time, the court found it unnecessary to determine when exactly a reasonably diligent plaintiff would have then discovered "the facts constituting the violation" under the federal discovery rule because, by July of 2009, the Zarecors themselves had filed a statement of claim in arbitration alleging misrepresentation, suggesting they had indeed actually discovered the facts constituting the violation more than two years before their federal claim was filed in November of 2011.

Thus, fraud is deemed to be "discovered" not only when the plaintiff actually knows those facts constituting fraud, but also when a reasonably diligent plaintiff *would have known* the facts constituting fraud. This, of course, requires the discovery of the facts constituting the violation, and one of those facts, in the case of fraud, is scienter—"a mental state embracing intent to deceive, manipulate, or defraud." *Merck*, 599 U.S. at 637, 648–49. Therefore, fraud is not "discovered" until facts—including those which would prove that a defendant made a material misstatement with an intent to deceive, not merely innocently or negligently—are actually known by the plaintiff or would have been known by a reasonably diligent plaintiff. *Id.* It is not enough for a plaintiff to know of an incorrect prediction about a firm's future earnings. *See id.* at 650. Instead, there must be facts suggesting that a reasonably diligent plaintiff would have known someone had deliberately lied or withheld information in their representation about

that firm's future earnings. *See id.* This is particularly important in federal securities cases due to the heightened pleading standards required for the scienter element of § 10(b). *See* 15 U.S.C. § 78u–4(b)(2). To adequately plead scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* A "strong inference" is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *W. Va. Pipe Trades*, 845 F.3d at 390 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). In *W. Va. Pipe Trades*, the court found the appellants did not discover or with reasonable diligence would not have discovered facts constituting the deceptive act as well as an intent to deceive when articles published found that corporate-sponsored research studies had over-emphasized favorable reported results because the articles themselves attributed the problems with the studies to be due to the nature of corporate-sponsored research, not to fraud. It wasn't until the Senate Finance Committee released its finding that the appellee company had intentionally edited studies to omit unfavorable results that appellants were charged with having discovered "facts constituting the violation."

For the cause of action at hand to be timely, this Court must examine the facts known or what facts should have been known to a reasonably diligent plaintiff before February 10, 2015, two years before the complaint in this case was filed. Management Defendants assert that, even if Plaintiffs had not actually discovered the alleged misrepresentations and omissions, a "reasonable investor" would have conducted an investigation and discovered the facts constituting the violation by, "at the latest, July 2014." Management Defendants argue that the complaint itself establishes that within 12 months of the Dauterive acquisition, PAC had defaulted on its bank loans, and widely missed its projected earnings. However, "[a]n incorrect prediction about a firm's future earnings, by itself, does not automatically tell us whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error." *Merck*, 559 U.S. at 650. Nevertheless, Management Defendants argue that after seeing the large discrepancy between the predicted earnings and the actual earnings, a reasonable investor would have begun an investigation via a simple request for information to PAC, which would have led to the discovery of the internal memorandum and Crowe Horwath Audit report.

Similar to the facts presented in *Ritchey*, Plaintiffs have pled that they were involved in a prior relationship with Management Defendants through their prior investments in PAC. The

extent of this prior relationship and its impact on the trust Plaintiffs had in Management Defendants raises a factual issue inappropriate for resolution on a motion to dismiss. *See Ritchey*, 244 F.3d at 638–41 (finding that the effect of the prior relationship with defendant on whether plaintiffs had sufficient facts beyond a level of mere suspicion to reach a point which the victims would be incited to investigate was a factual question that could not be resolved on summary judgment). Further, the PPM went to great lengths to lay out all of the risk factors involved in investing in Dauterive. "It is well settled that financial performance, standing alone, does not necessarily suggest fraud at the time of the sale, but could also be explained by poor management, general market conditions, or other events unrelated to fraud, creating a jury question on [ ] notice." *Gray v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996). *See also La Grasta v. First Union Securities, Inc.*, 358 F.3d 840, 847 (2004) ("There may be numerous reasons, other than fraud, for a stock to decline (even steeply) in price."); *LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 446 (7th Cir. 1995) (declining to find that a big drop in price is notice per se of the possibility of securities fraud in light of other circumstances, such as the stock's history of volatility).

Plaintiff's complaint alleges that they were not aware of an intent to deceive until after the bankruptcy proceedings began in 2016, when they received copies of an internal memorandum and audit. Predictions about future earnings that turn out to be incorrect are alone not enough to plead scienter—"'a mental state embracing intent to deceive, manipulate, or defraud." *Merck*, 599 U.S. at 637 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12 (1976)). It cannot be said, as a matter of law, "[a]ccepting Plaintiffs' allegations as true and giving Plaintiffs the benefit of all reasonable inferences," that the discrepancy between the projected and the real EBITDA, by itself, was enough to give the Plaintiffs notice of the "facts constituting the violation," including scienter, nor that a reasonably prudent plaintiff, in light of the circumstances, would have conducted an investigation leading to discovery of such facts before April of 2015. *Cohen*, 385 F.Supp.2d at 946 (citing *Frey*, 44 F.3d at 671 (providing the standard for a motion to dismiss)). Therefore, the complaint is timely.

### III.   Federal Securities Claims

   a. *Section 10(b) and Rule 10b–5*

      1. Heightened Pleading Standards

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "SEC Rule 10b–5 implements this provision by making it unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 CFR § 240.10b–5(b)). A cause of action for private securities fraud based on violations of § 10(b) and Rule 10b–5 requires: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Congress, in the Private Securities Litigation Reform Act (PSLRA), enacted two heightened pleading requirements for § 10(b) private securities fraud cases. *See* 15 U.S.C. § 78u–4(b)(2) ("Rule 9(b)"). "The first requires that the complaint specify each false statement or misleading omission and explain why the [false statement or] omission was misleading." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741–42 (8th Cir. 2002) (quoting *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654 (8th Cir. 2001)). The second requires that "the complaint state 'with particularity' facts giving rise to a 'strong inference' that the defendant acted with the scienter required for the cause of action." *Id.* (quoting *Green Tree*, 270 F.3d at 654). The purpose of these heightened standards "was generally to eliminate abuse securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'" *Id.* at 742 (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002)). Further, "it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997).

"Although the Court must assume all factual allegations in the complaint are true in deciding a motion to dismiss under Rule 12(b)(6), 'under the Reform Act we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute." *Cohen*, 385 F. Supp. 2d at 947 (quoting *Green Tree*, 270 F.3d at 660).

> A complaint subject to Rule 9(b) "must identify who, what, where, when, and how." It must "specify the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result."

*Streambend Properties II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1013 (8th Cir. 2015) (internal citations omitted) (quoting *Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009)).

Management Defendants argue that the complaint fails to meet the heightened pleading requirements of the PSLRA in three ways: by 1) failing to identify the speaker and the recipient of the fraud by impermissibly engaging in group pleading; 2) failing to explain how the statements were materially misleading; and 3) failing to allege the element of scienter with particularity.

### i. Group Pleading

"Simply alleging that defendants made a particular statement at a given time, without providing further particulars about who made the statement or when, and then showing in hindsight that the statement is false misses the PSLRA pleading requirement." *In re Navarre Corp.*, 299 F.3d at 743. Further, vaguely attributing fraudulent representations and conduct to multiple defendants, generally, in a group pleading fashion, does not satisfy Rule 9(b). *See Streambend Properties II*, 781 F.3d at 1013. Instead, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id.* (citing *Trooien v. Mansour*, 608 F.3d 1020, 1030 (8th Cir. 2010)).

In essence, Plaintiffs' complaint pleads three fraudulent acts of Management Defendants: 1) the April 8, 2013 PPM represented that Dauterive's "historical financial information" showed an EBITDA gain of $2.434 million; 2) the April 8, 2013 PPM represented that Dauterive's "full year" EBITDA estimate was $6.559 million and that PAC's net income would be over $4 million in 2013 and $9 million in 2014; and 3) the April 8, 2013 PPM stated that "management ha[d] identified a number of ways to enhance internal controls." The complaint alleges that each defendant "was responsible for the content of the PPM and ultimately ratified and approved the statements made therein" and also "met in person with the physicians . . . to discuss the potential Dauterive acquisition." Doc. 1 at 8–9. Further, the complaint states that "[e]ach of the Defendants was personally involved in drafting and/or approving the PPM, including the false

and misleading statements." *Id.* at 10. Management Defendants allegedly walked the Physicians through the key parts of the PPM and the Management Due Diligence Report at an in-person meeting in Dakota Dunes, South Dakota, held in February 2013. *Id.* at 11.

Beyond these general allegations, Plaintiffs allege that Defendant Hurlburt "told the Physicians that a return of three-to-four times their investment was assured, and that he was expecting a return of ten times their investment." *Id.* at 10. Plaintiffs assert that Defendant Thompson was specifically approached by a PAC employee and warned that PAC would be unable to achieve the projected EBITDA. *Id.* at 5. Finally, Page 4 of the Due Diligence Report contained a recommendation "[o]n behalf of the PAC executive leadership team" specifically attributed to Defendants Hurlburt, Rissing, and Thompson, which encouraged the acquisition of Dauterive Hospital. *Id.* at 13; Doc. 32-1 at 125. The remaining pages of the Due Diligence Report also appear to be written from the perspective on the Management Defendants through the repeated use of the word "we" throughout the document.

"'Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *Streambend Properties II*, 781 F.3d at 1013 (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). The Fifth Circuit provides further guidance as to what is required to inform each defendant of their particular conduct in the context of corporate documents:

> [C]orporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement. Various unattributed statements within documents may be charged to different individuals, and specific facts may tie more than one individual to the same statement.

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (2004). Nevertheless, where it is generally pleaded that the individual defendants "each controlled the contents of and participated in writing" the corporate documents, such "conclusory allegation[s]" fail to meet the

specificity required by the PSLRA when they fail to specify "which portions or statements within these documents are assignable to each individual defendant." *Id.*

The Court finds Plaintiffs have pleaded the allegedly fraudulent acts with sufficient particularity to warn each defendant as to his involvement in the acts. While the general allegations that Defendants were involved in the formulation of the PPM alone would be insufficient, Plaintiffs have plead sufficient facts tying each individual Management Defendant to the authorship of the PPM and therefore the authorship of the allegedly fraudulent information.

### ii. Materiality

The complaint must not only allege that false statements or omissions were made, but also why those statements would have been false or misleading at the time in which it is alleged they were made. *See In re Navarre Corp.*, 299 F.3d at 743 (citing *In re Vantive Corp.*, 283 F.3d at 1086. This requires Plaintiffs to plead "the existence of any facts or further particularities that, if true, demonstrate that defendants had access to, or knowledge of, information contradicting their public statements when they were made." *Id.* at 742. Further, the Court notes "that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (citing 17 C.F.R. § 240.10b–5(b)).

Plaintiffs plead three fraudulent acts of Defendants: 1) representing that Dauterive's "historical financial information" showed an EBITDA gain of $2.434 million; 2) representing that Dauterive's "full year" EBITDA estimate was $6.559 million and that PAC's net income would be over $4 million in 2013 and $9 million in 2014; and 3) representing that "management ha[d] identified a number of ways to enhance internal controls." Plaintiffs allege that all of these statements were misleading because Defendants knew of information contradicting those representations. Indeed, Plaintiffs allege the existence of two documents which Defendants were aware of that should have been disclosed in order to render the representations made to investors not misleading: 1) a PAC Board internal memorandum dated January 9, 2013 in which the seller's projection of 2013 EBITDA for Dauterive was a $50,000 loss; and 2) an audit report from the accounting firm Crowe Horwath LLP which the Defendants received in April just days before releasing the finalized PPM to Plaintiffs which was harshly critical of PAC's internal

financial controls. Further, Plaintiffs allege that Defendant Thompson was told by a PAC employee in December 2012 that they would not be able to obtain their projected savings related to benefits at Dauterive, which were presumably part of the assumptions made in PAC's calculations of projected future EBITDAs. Plaintiffs therefore adequately plead the existence of facts that, "if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made." *See In re Navarre Corp.*, 299 F.3d at 742.

To present an actionable claim for securities fraud, it is not enough to allege misstatements. Instead, "the alleged misstatements must be material." *In re AMDOCS Ltd. Sec. Litig. v. AMDOCS Ltd.*, 390 F.3d 542, 547 (8th Cir. 2004) (citing *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997)). Generally, materiality is a question of fact reserved for the jury. *Id.* However, where a court finds that "no reasonable investor could have been swayed by the alleged misrepresentation," alleged misrepresentations are immaterial as a matter of law and the complaint may be properly dismissed. *Id.* (citing *Parnes*, 122 F.3d at 546); *see also In re Control Data Corp. Sec. Litig.*, 933 F.2d 616, 6321 (8th Cir. 1991) ("The trier of fact is uniquely competent to determine materiality, as that inquiry requires delicate assessments of inferences a reasonable investor would draw from a given set of facts."). On the other hand, where a court finds that the "allegations suffice to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality requirement" the court will "draw the reasonable inference that the defendant is liable for the misconduct," and the complaint will survive a motion to dismiss. *See Matrixx Initiatives*, 563 U.S. at 46 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

> A misrepresentation or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Alleged misrepresentations can be immaterial as a matter of law if they: 1) are of such common knowledge that a reasonable investor can be presumed to understand them; 2) present or conceal such insignificant data that, in the total mix of information, it simply would not matter; 3) are so vague and of such obvious hyperbole that no reasonable investor would rely upon them; or 4) are accompanied by sufficient cautionary statements.

*In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d at 548 (internal citations omitted). The "bespeaks caution doctrine" provides that "cautionary language which relates directly to that which the

Plaintiffs claim to have been misled, if sufficient, renders the alleged misrepresentation or omission immaterial as a matter of law." *Id.* (citing *Parnes* at 548).

The Court cannot agree with Management Defendants' argument that, as a matter of law, the PPM contained sufficient cautionary language so as to render any alleged misrepresentations immaterial because the Court cannot agree that "no reasonable investor would have been swayed by the alleged misrepresentation." *See id.* at 547; *see also Parnes*, 122 F.3d at 548 (Dismissal should only be granted under the bespeaks caution doctrine where "the documents containing defendants' challenged statements include enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading.") Plaintiffs contend that PAC's representations of Dauterive's "historical financial information" were misleading because Defendants asserted 1) the EBITDA figure came from "financial statements which were prepared by [the seller]"; 2) that Dauterive was currently "generating well in excess of $3M in EBITDA"; and 3) that Dauterive should "maintain" a positive EBITDA. Plaintiffs allege they were not informed, though Defendants were, of the manipulations made to the numbers actually provided by the seller, though Defendants did disclose other later adjustments made to the already manipulated figure. Further, Plaintiffs maintain that because the full-year EBITDA projections relied on these "historical" numbers, the full-year projections were misleading for the same reasons. To make these statements non-misleading, Plaintiffs argue, Management Defendants should have disclosed the seller's projected EBITDA number, as well as the manipulations made to that number that resulted in an EBITDA nearly 25 times higher than the seller's. Finally, Plaintiffs argue that, although Plaintiffs stated that "financial reporting and internal controls may not perform as anticipated" it was materially misleading to suggest that "management ha[d] identified a number of ways to enhance internal controls that are not yet in place" because Management Defendants did not inform Plaintiffs of weaknesses uncovered in a third-party audit.

Management Defendants argue that all of these statements are forward-looking and accompanied by sufficient cautionary language that speaks directly to the Plaintiffs' claim. Therefore, Management Defendants argue that, as a matter of law, these statements did not affect the "total mix" of information the document provided investors. *See Yellen v. Hake*, 437 F.Supp.2d 941, 968 (S.D. Iowa 2006) (citing *Parnes*, 122 F.3d at 548). Indeed, the PPM included a "Special Note Regarding Forward-Looking Statements" which warned that those forward

looking statements were "based upon estimates and assumptions made by [PAC's] management that, although believed to be reasonable, are subject to numerous factors, risks and uncertainties." Doc. 32-1 at 54. However, the note was intended to help identify "those statements that are based upon management's current plans and expectations as opposed to historical and current facts." *Id.* Some of Plaintiffs' claims, on the other hand, rely on the argument that Management Defendants engaged in fraudulent misrepresentation by presenting certain information as "historical fact" when it was actually based on "one-time paper adjustments" and "accounting magic." Doc. 31 at 25 (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247–51 (2d Cir. 2016)). While Management Defendants may have made clear that investing in Dauterive, especially in light of its size compared to PAC's past investments, as well as uncertainty in the legislature as far as the continued sustainability of the Affordable Care Act, Medicare, Medicaid, and other government spending, it cannot be said as a matter of law at this stage in the pleadings that sufficient cautionary language was used to offset the material misrepresentations alleged here.

### iii. Scienter

Generally, the issue of whether a particular intent existed is a question of fact for the jury. *In re K-tel Intern., Inc. Sec. Litig.*, 300 F.3d at 894. However, under the PSLRA "inferences of scienter do not survive if they are merely reasonable . . . Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." *Green Tree*, 270 F.3d at 660. Nevertheless, the PSLRA "did not alter the substantive nature of the scienter requirement." *Kushner*, 317 F.3d at 828. "Specifically, scienter may be demonstrated by severe recklessness involving 'highly unreasonable omissions or misrepresentations' amounting to 'an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Id.* (citing *K & S P'ship v. Cont'l Bank, N.A.*, 952 F.2d 971, 978 (8th Cir. 1991) (internal quotations omitted), *cert. denied*, 505 U.S. 1205, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992)). "Recklessness, then, may be shown where unreasonable statements are made and the danger of misleading investors is so obvious that the defendant must have been aware of it." *Id.* "'Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to

information contradicting their public statements.'" *Id.* (citing *Novak v. Kansas*, 216 F.3d 300, 308 (2d Cir. 2000)).

Management Defendants argue that Plaintiffs have failed to establish a strong inference of scienter because Plaintiffs' allegations "are cast against Defendants as a group—with no showing of what any individual Defendant thought at any time" and improperly rely on a broad motive argument. "[M]otive and opportunity are generally relevant to a fraud case, and a showing of unusual or heightened motive will often form an important part of a complaint that meets the Reform Act standard." *Green Tree*, 270 F.3d at 660. Indeed, Plaintiffs have failed to establish a motive by failing to plead anything beyond a general desire to make the company appear attractive to potential buyers and to increase their personal compensation. *See Kushner*, 317 F.3d at 830 (citing *Green Tree*, 270 F.3d at 661) ("Pleading the simple fact 'that a defendant's compensation depends on corporate value or earnings does not, by itself, establish motive to fraudulently misrepresent corporate value or earnings.'"); *In re K-tel Intern., Inc. Sec. Litig.*, 300 F.3d at 894 (Noting that a general desire to make a company appear attractive to potential buyers is insufficient to establish motive, but "where an individual defendant will benefit to an unusual degree, based upon the magnitude of a compensation package tied to earnings and the time of an overstatement of earnings, motive is sufficiently pled."); *Horizon Asset Management Inc. v. H & R Block, Inc.*, 580 F.3d 755, 766 (8th Cir. 2009) (noting that the 8th Circuit has found that bonuses as high as $630,000 and $355,000 paid to a corporate officer under a performance plan are not so unusual as to establish a motive).

Nevertheless, "[t]he absence of a motive allegation, though relevant, is not dispositive." *Matrixx Initiatives*, 563 U.S. at 48 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007)); *see also In re K-tel Intern., Inc. Sec. Litig.*, 300 F.3d at 894 (citing *Green Tree*, 270 F.3d at 660) ("Without a showing of motive or opportunity 'other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard.'"). This Court has already established that Plaintiffs have not engaged in group pleading, and have specifically alleged how each Management Defendant had access to information which would render statements attributed to them materially misleading. *See In re Patterson Companies, Inc. Sec. Litig.*, 479 F. Supp. 2d at 1032 ("A classic fact pattern of recklessness depicts defendants publishing statements 'when they knew or had access to information suggesting that their public statements were materially inaccurate.'"). Therefore, Plaintiffs' allegations, "taken collectively,"

if true, give rise to a "cogent and compelling" inference that Management Defendants elected not to disclose the reports of adverse findings which may have significantly altered the total mix of information available to investors. *See Tellabs*, 551 U.S. at 326 (noting that factual allegations are viewed "holistically" and "collectively" rather than "in isolation").

2. Reliance

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). "This is because proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Erica P. John Fund., Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation. In that situation, the plaintiff plainly would have relied on the company's deceptive conduct." *Id.*

Management Defendants argue that Plaintiffs have failed to adequately plead reliance by improperly relying on a presumption of reliance that does not apply to the allegations at hand and by alleging that they agreed to invest in the Dauterive acquisition in February 2013, before the PPM was provided to the Plaintiffs. Plaintiffs state that they are indeed entitled to a presumption of reliance because their allegations are primarily of omissions. Further, Plaintiffs argue that the misrepresentations made at the in-person meeting in February 2013 were the very same made in the PPM in April 2013 and, therefore, they were relying on the same misrepresentations made by Management Defendants.

Where the failure to disclose information is the principal fraud, "positive proof of reliance is not a prerequisite to recovery." *Affiliate Ute Citizens v. United States*, 406 U.S. 128, 153–54. "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." *Id.* The relaxed requirement in cases of nondisclosure recognizes "the difficulty of proving reliance on the negative." *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 717 (8th Cir. 1978) (quoting *The Reliance Requirement in Private Actions Under SEC Rule 10b–5*, 88 HARV. L. REV. 584, 590 (1975) [hereinafter *The Reliance Requirement*]). However, "[w]here the securities fraud at issue closely resembles the tort of deceit, the plaintiff encounters no special difficulty in

attempting to demonstrate reliance. The lack of any barrier to proof permits the private action adequately to serve its [compensatory and deterrent purposes] purposes." *The Reliance Requirement*, 88 HARV. L. REV. at 589. Thus, where affirmative misrepresentation cases are involved, there is no need to presume reliance as causation may be tested directly.

While Plaintiffs attempt to characterize this case as one involving primarily nondisclosure, the Court has carefully examined the pleadings and does not view it as such. *See generally Vervaecke*, 578 F.2d at 717–18 (dismissing Plaintiff's characterization of the case as involving primarily nondisclosure after examination of the pleadings). Plaintiffs argue that the complaint alleges Management Defendants made the following materially false statements: 1) that the 2012 EBITDA was $2.434 million, when it was less than $100,000; 2) that the 2012 EBITDA of $ 2.434 million was "derived from Dauterive Hospital's internal unaudited financial statements which were prepared by the seller"; and 3) that, as of February 2013, Dauterive was "generating well in excess of $3M in EBIDTA currently." Doc. 31 at 16. Then Plaintiffs argue that the complaint alleges "Defendants omitted the following material information necessary to make disclosed information not misleading:" 1) that at least $1.4 million of the 2012 EBITDA of $2.434 actually consisted of "additions" made by Defendant Thompson to the seller's numbers; 2) that the seller's own projection for the full year following acquisition for Dauterive was a loss of nearly $50,000, in contrast to Defendants' projection of $6.559 million; 3) that Defendants based their full-year-following-acquisition estimate on the $2.434 million 2012 EBITDA which was misrepresented as based on the seller's own financial statements; 4) that Defendant Thompson was told that the number he projected for savings relating to benefits was unattainable; and 5) that days before the PPM was issued, PAC's independent auditors issued an audit report finding material weakness in PAC's internal controls. Doc. 31 at 16–17.

Despite this presentation, Plaintiffs complaint may be better summarized as alleging Management Defendants made affirmative misrepresentations that the sellers of Dauterive hospital provided that the 2012 EBITDA was $2.434, that Dauterive was currently generating in excess of $3 million EBITDA, that Dauterive would generate $6.559 million in the year following the acquisition, and that PAC had identified ways to correct deficiencies in PAC's internal controls. The facts that Defendant Thompson had been approached by an employee, that PAC's independent auditors had issued an audit report, and that additions had been made to the seller's real projections are more accurately characterized as factual allegations that render

24

Defendants' affirmative representations inaccurate or, at the very least, that Defendants had access to information which contradicted their own projections. Therefore, the "thrust of what [Plaintiffs] actually pleaded was the use of fraudulent misstatement and omission within the four corners of an offering prospective which mislead" the Plaintiffs to invest in PAC in order to fund the Dauterive acquisition. *See Vervaecke*, 578 F.2d at 718.

Since this is not a case where the Court may presume reliance, Plaintiffs must affirmatively plead facts which show Plaintiffs relied on the alleged misrepresentations when deciding to invest. *See Halliburton*, 563 U.S. at 810 (2011). Plaintiffs have done so. Although Plaintiffs explicitly allege that "[f]ollowing the February 2013 in-person meeting in Dakota Dunes, the Physicians agreed to invest the $3 million of equity required for PAC to complete the Dauterive acquisition," Doc. 1 at 20, Plaintiffs also allege that the same material was presented in the in-person meeting in February 2013 as was presented in the April 2013 PPM. Further, Plaintiffs did not actually sign the subscription agreements and invest until after the PPM was presented to them. Therefore, Plaintiffs have still sufficiently pleaded reliance with respect to the allegations that Management Defendants misrepresented the historical and projected EBITDA numbers and the quality of the internal controls. Plaintiffs have established that they were "aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *See Halliburton*, 563 U.S. at 810.

### 3. Loss Causation

A private cause of action for securities fraud is not intended to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc., v. Broudo*, 544 U.S. 336, 344 (2005). Therefore, a cause of action for private securities fraud based on violations of § 10(b) and Rule 10b–5 requires Plaintiffs show that Management Defendants' misrepresentations "caused the loss for which the plaintiff seeks to recover." 15 U.S.C. § 78u–4(b)(4). "Loss causation in a securities fraud case is analogous to the common law's requirement of proximate causation." *McAdams v. McCord*, 584 F.3d 1111, 1114 (8th Cir. 2009) (citing *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008)). "The plaintiff must show 'that the loss was foreseeable *and* that the loss was caused by the materialization of the concealed risk.'" *Schaaf*, 517 F.3d at 550 (emphasis in original).

Loss causation, unlike the elements of material misrepresentation and scienter, is not subject to the heightened pleading standards of the PSLRA. Instead, the pleading of loss causation is subject only to Rule 8(a)(2)'s requirement of a short and plain statement of the claim. *Dura Pharmaceuticals*, 544 U.S. at 346. Management Defendants argue that Plaintiffs have failed even this "simple test" by using "threadbare, conclusory statements" which fail to show how the alleged misrepresentations, and not other market factors, caused the loss of their investment.

Plaintiffs' complaint alleges that, relying on Management Defendants' representations of Dauterive's historical performance, as well as Dauterive's predicted performance, Plaintiffs agreed to invest the additional capital into PAC which would fund the Dauterive acquisition. Plaintiffs also allege that those representations were inaccurate and based on undisclosed additions to the seller's true projections. One of those projections was a $50,000 loss in the year following the acquisition. Finally, Plaintiffs allege that the acquisition did indeed result in financial woes, and that it was Dauterive, and not any of the other hospital's owned by PAC, that was the driving force behind PAC's bankruptcy filing. Plaintiffs have thus alleged "enough facts to raise a reasonable expectation that discovery will reveal evidence of loss causation." *In re St. Jude Medical, Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 908 (D. Minn. 2011). Thus, the Court finds Plaintiffs have sufficiently pleaded loss causation by showing that the loss was foreseeable—in fact, had been foreseen by the sellers themselves—*and* that the loss was caused by the materialization of the misrepresentations—namely, that the EBITDA of Dauterive was in fact much lower than Management Defendants represented. Therefore, Management Defendants motion to dismiss with respect to Count I is denied.

### b. *Section 20(a)*

Under Section 20(a) of the Securities Exchange Act, "[e]very person who, directly or indirectly, controls any person liable" under Section 10(b) and Rule 10b–5 "shall also be liable jointly and severally with and to the same extent as such controlled person is liable." 15 U.S.C. § 78t. In short, the statute generally subjects to liability "those who, subject to certain defenses, 'directly or indirectly' control a primary violator of the federal securities laws." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010). The Eighth Circuit has construed the statute liberally, "requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Id.* (citing *Farley v. Henson*, 11 F.3d 827, 836 (8th Cir.

1993)). A plaintiff's prima facie case requires: "(1) that a primary violator violated the federal securities laws; (2) that the alleged control person actually exercised control over the general operations of the primary violator; and (3) that the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated." *Id.* (internal quotations omitted). "If a plaintiff satisfies the prima facie burden, the burden shifts to the defendant to show that it 'acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.'" *Id.* at 874 (quoting 15 U.S.C. § 78t(a)).

### i.  Management Defendants

Management Defendants' sole argument as to why Plaintiffs have not stated a claim for a violation of Section 20(a) is because it is a derivative claim which requires an underlying violation of the SEA. As this Court explained above, however, Plaintiffs have sufficiently stated a claim for a violation of Section 10(b) and Rule 10b–5. Therefore, Plaintiffs have successfully alleged a claim for a violation of Section 20(a) with regard to Management Defendants and the Motion to Dismiss with respect to the federal securities law claims is denied.

### ii.  Defendant Newell

To the extent Defendant Newell argues that Count II should be dismissed against him because Plaintiffs did not properly plead a primary violation of the Securities Exchange Act, Defendant's Newell's motion is similarly denied. However, Defendant Newell also argues that Count II should be dismissed as to him because Plaintiffs have failed to plead that Defendant Newell could have or actually did exercise control over the Management Defendants. The Court agrees.

SEC regulations define control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. 17 C.F.R. § 230.405. However, the mere ability to control is not enough. Unless the controlling person was "actively participating in the decisionmaking process of the [primary violator], no controlling liability can be imposed." *Lustgraaf*, 619 F.3d at 875 (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002). The complaint generally alleges that Defendant Newell "had the power and authority to cause the Management Defendants and/or PAC to engage in the wrongful conduct identified" given his "influential position on PAC's Board of Directors and the Audit Committee." While

the question of whether an individual is a controlling person is "an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions," *Cumming v. Paramount Partners, LP*, 715 F.Supp.2d 880, 907 (D. Minn. 2010), pleading titles and status as a significant beneficial owner alone fails to demonstrate actual control. *See Beaver Cnty Employees' Retirement Fund v. Tile Shop Holdings, Inc.*, 94 F.Supp.3d 1035, 1055 (D. Minn. 2015) (holding that plaintiffs failed to plead defendants actually exercised control where their titles, status as beneficial owners, and signatures on registration documents were the only facts presented). Plaintiffs have failed to allege facts to suggest that Defendant Newell, or even the Audit Committee more generally, had the ability to control day-to-day operations of PAC or the Management Defendants, much less any facts that may plausibly be read to state that Defendant Newell exercised such control. Therefore, with regard to Defendant Newell, Count II is dismissed.

## IV.    State Law Fraud Claims

Counts III – VI of Plaintiffs' complaint alleges violations of the law of the State of South Dakota: 1) deceit under S.D.C.L. § 20-10-1; 2) actual fraud in relation to contract under S.D.C.L. § 53-4-5; 3) constructive fraud in relation to contract under S.D.C.L. § 53-4-6; and 4) common law fraud. Defendants argue that Plaintiffs have actually pleaded only two state law claims for fraud, as opposed to the four claims enumerated in the complaint: (1) a tort action seeking damages, and (2) a contract action seeking rescission. Defendants argue that the claims sounding in tort and in contract be dismissed as they 1) necessarily rely on supplemental jurisdiction, which would be lacking should the motion to dismiss the federal securities claims be granted; and 2) are also inadequately pled as they do not meet the standards of Rule 9(b) and do not adequately plead reliance.

The Court already found above that Plaintiffs have not engaged in group pleading and have therefore pleaded with sufficient particularity to meet the requirements of the PSLRA with respect to Management Defendants. This finding also applies to Plaintiffs' state law claims. The Court also found that Plaintiffs sufficiently pleaded federal securities law violations, therefore Plaintiffs may rely on supplemental jurisdiction for their state law claims. Thus, Management Defendants' Motion to Dismiss Counts III-VII on the grounds of failure to plead with particularity and lack of jurisdiction is denied. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966) (A federal court may retain jurisdiction of a state law claim where it

has jurisdiction of a federal claim and the state and federal claims derive from a common nucleus of operative fact.). The Court also denies Management Defendants' Motion to Dismiss with respect to Count VIII on the grounds of lack of supplemental jurisdiction. Similarly, the Court denies Defendant Newell's Motion to Dismiss regarding Counts III-VIII on the grounds of lack of supplemental jurisdiction. However, because Defendant Newell was not alleged to have committed a primary violation of the Securities Exchange Act, the Court has not yet examined whether Plaintiffs have pleaded with sufficient particularity to meet the requirements of the PSLRA with respect to Defendant Newell and thus takes care to do so in the analysis of the state law claims below.

### a. Deceit and Common Law Fraud

With respect to Counts III and VI, claims for deceit under SDCL § 20-10-1 and for common law fraud, the Court disagrees with Defendants' contention that they are one and the same. Though "[t]he elements for common law fraud and statutory deceit are essentially identical under South Dakota law," they are nevertheless two distinct causes of action. *See Stockmen's Livestock Market, Inc. v. Norwest Bank of Sioux City*, 135 F.3d 1236, 1243 (1998). The essential elements of common law fraud under South Dakota law are:

> That a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he or she did in fact rely on it and was induced thereby to act to his or her injury or damage.

*Id.* (quoting *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D. 1991)). SDCL § 12-10-1, which governs actions for deceit, provides: "One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." The following acts come within the meaning of deceit:

1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
2) The assertion, as a fact, or that which is not true, by one who has no reasonable ground for believing it to be true;
3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
4) A promise made without any intention of performing.

SDCL § 20-10-3. The statutory elements of deceit are not only similar to those of the common law cause of action for fraud under South Dakota law, but also to the elements of a federal law

claim for private securities fraud under Rule 10b–5 and § 10(b) of the Securities Exchange Act. Thus, consistent with its findings above, the Court concludes that Plaintiffs have adequately pleaded state law violations of deceit and common law fraud under South Dakota law as to Management Defendants.

In analyzing the state law claims of deceit and common law fraud against Defendant Newell, the Court notes that, under South Dakota law, "every participant in a fraud and each one who assists another in the perpetration of the fraud is liable to the injured party." *Cohen*, 385 F. Supp. 2d at 954 (quoting *Tucek v. Mueller*, 511 N.W.2d 832, 837 (S.D. 1994)). Plaintiffs allege that Defendant Newell participated in the fraud by "review[ing], approv[ing], and/or author[ing] the PPM and Due Diligence Report. Thus, Plaintiffs have pleaded facts suggesting Defendant Newell, at the very least, assisted another in the perpetration of a fraud and Defendant Newell's Motion to Dismiss with respect to Counts III and VI is denied.[3]

### b. Actual Fraud in Relation to Contract

With respect to Counts IV and V, the claims sounding in contract, Defendants argue that South Dakota does not recognize claims for "Fraud in Relation to Contract" and, if such claims do exist, that Defendants did not contract with Plaintiffs, a necessary element of such claims. South Dakota law provides for rescission of a written contract when the consent of a contracting party was "given by mistake or obtained through duress, fraud, or undue influence." SDCL § 53-11-2. Fraud can be either actual or constructive. *See* SDCL § 53-4-5 and § 53-4-6. South Dakota law also allows a defrauded plaintiff to bring a tort action or a contract action based on the same facts. *See Stabler v. First State Bank of Roscoe*, 865 N.W.2d 466, 474–75 (S.D. 2015) (citing SDCL 20-10-1 (Tort) and SDCL 53-4-5 (Contract)). The plaintiff "may affirm the contract and bring a tort action for deceit seeking monetary damages, or he may repudiate the contract and bring a contract action for rescission or revision." Id. at 475 (quoting *Ashoff v. Mobil Oil Corp.*, 261 N.W.2d 120, 123 (S.D. 1977)). The plaintiff may pursue both of these alternative remedies "so long as no double recovery is awarded." *Id.* (quoting *Ripple v. Wold*, 549 N.W.2d 673, 674–

---

[3] The Court notes, however, that should it have taken Plaintiffs' complaint literally when Plaintiffs stated that they agreed to invest after the February 2013 meeting, the statements within the PPM cannot be shown to be material nor can Plaintiffs show reliance on such statements. At this stage, the Court does not take such a literal interpretation and instead reads the complaint together as a whole. However, should such a literal interpretation be proven true, Defendant Newell likely faces little exposure to liability, as his only apparent connection to the allegedly fraudulent statements is through the PPM.

75 (S.D. 1996)). The Eighth Circuit explained this election of remedies in *Pa. Nat'l Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945 (8th Cir. 2004):

> Designed to prevent double recovery for a single injury, the election-of-remedies rule applies when a party possesses two appropriate but inconsistent remedies and deliberately pursues one remedy to the other's exclusion. The rule does not prohibit assertion of multiple causes of action, nor does it preclude pursuit of consistent remedies, even to final adjudication, so long as the plaintiff receives but one satisfaction.

*Id.* at 950–51 (citations omitted). Therefore, Plaintiffs may properly pursue both a contract and tort action for the facts at issue here, so long as the complaint states a plausible claim for relief in both actions.

SDCL § 53-4-5 defines actual fraud in relation to contract and § 53-4-6 defines constructive fraud in relation to contract. Both provisions describe circumstances which make the contract voidable. *See Schmidt v. Wildcat Cave, Inc.*, 261 N.W.2d 114, 116–17 (S.D. 1977). SDCL § 53-4-5 provides:

> Actual fraud in relation to contracts consists of any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:
> (1) The suggestion as a fact of that which is not true by one who does not believe it to be true;
> (2) The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believe it to be true;
> (3) The suppression of that which is true by one having knowledge or belief of the fact;
> (4) A promise made without any intention of performing it; or
> (5) Any other act fitted to deceive.
> Actual fraud is always a question of fact.

SDCL § 53-4-6 provides:

> Constructive fraud consists:
> (1) In any breach of duty which, without any actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him, by misleading another to his prejudice or to the prejudice of anyone claiming under him; or
> (2) In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.

"Although actual fraud may be the basis of tort actions and contract actions, constructive fraud is the basis only for actions for the avoidance of contracts." *Schmidt*, 261 N.W.2d at 117. This is so because constructive fraud requires no fraudulent intent, which is inconsistent with the intent required for deceit under SDCL 20-10 and the common law. *Id.*

Defendants argue that a rescission claim cannot be brought against a defendant who is not a party to the contract and, because Plaintiffs have not identified a contract between them and Defendants, Plaintiffs' contract actions for fraud should be dismissed. Plaintiffs argue that SDCL § 53-4-5 expressly permits claims to be brought against non-contract parties who aid in the fraud by defining actual fraud in relation to contract as fraudulent "acts committed by a party to the contract, *or with his connivance.*" Doc. 31 at 56 (citing SDCL § 53-4-5) (emphasis added)). Plaintiffs assert that the South Dakota Supreme Court construed this language to permit claims against a company that was party to a contract, as well as its officers in *Brevet Int'l, Inc. v. Great Plains Luggage Co.*, 604 N.W.2d 268 (S.D. 2000). Defendants respond saying *Brevet* does not stand for such a proposition and that the language in the statute merely protects against a contracting party circumventing liability by having a non-contracting party commit fraud for him. Doc. 34 at 33. The Court agrees with Defendants.

In *Brevet*, Brevet International, Inc. contracted with Great Plains Luggage Company to provide management consulting services in order to resolve Great Plains' manufacturing problems. *Id.* at 269. After their relationship turned sour, Brevet initiated a suit against Great Plains and its three principal officers, directors, and shareholders in their individual capacity alleging breach of contract and fraud. *Id.* at 269–70. Great Plains and the individual defendants, in addition to filing counterclaims, moved for partial summary judgment with respect to the breach of contract claim (against the individual defendants), and the fraud claim (against all defendants). *Id.* at 270. The trial court granted the defendants' motion for partial summary judgment and Brevet appealed, arguing genuine issues of material fact existed so as to preclude the granting of partial summary judgment on the fraud claim and that the trial court improperly refused to pierce the corporate veil in order to hold the individual defendants personally liable. *Id.* at 271.

Brevet argued that one of Great Plains' principal officers made a false representation in their initial negotiations. *Id.* at 272. Great Plains argued the statement was true, or in the alternative, he believed it to be true. *Id.* Because a statement, even if believed to be true, may still constitute fraud if the declarant does not have sufficient information to support his statement, and because other issues of fact were still outstanding, the South Dakota Supreme Court found the claim could not be properly disposed of by summary judgment. *Id.* Nevertheless, the South Dakota Supreme Court found the lower court had properly dismissed all claims against the

individual defendants because Brevet had not met its burden of showing the corporation's separate legal existence had been used to "defeat public convenience, justify wrong, protect fraud, or defend crime" so as to justify piercing the corporate veil. *Id.* at 273–74. The court did not, as Plaintiffs claim, dismiss only the breach of contract claim against the individual defendants. Instead, it dismissed all claims against the individual defendants because they could not be held personally liable.

Only parties to a contract have rights in contract. *Mahan v. Avera St. Luke's*, 621 N.W.2d 150, 154 (S.D. 2001). The very definition of actual fraud expressly provides that it can be committed only by parties of a contract. *See Clausen v. National Geographic Soc.*, 664 F. Supp. 2d 1038, 1052–53 (D.N.D. 2009) (interpreting North Dakota's nearly identical actual fraud statute). Similarly, SDCL § 53-11-2, the statute providing for the remedy of rescission, provides that a party to a contract may rescind "[i]f consent of the party rescinding...was given by...fraud...by or with the connivance of the party as to whom he rescinds." There are no allegations which would, if proved, support a claim of actual or constructive fraud which would provide for rescission of the contract because no contract existed between Plaintiffs and Defendants. Because Plaintiffs have not alleged the connivance of the contracting party, PAC, nor alleged that the PAC's separate legal existence had been used to "defeat public convenience, justify wrong, protect fraud, or defend crime" so as to justify piercing the corporate veil, Plaintiffs have not alleged facts sufficient to support a claim of actual or constructive fraud under SDCL § 53-4-5 or § 53-4-6. Therefore, Counts IV and V of the complaint are dismissed as to all defendants.

### c. Negligent Misrepresentation

Count VII of the complaint alleges all Defendants engaged in negligent misrepresentation in their solicitation of additional funds for the Dauterive acquisition. As stated above, Defendants argue that Count VII should be dismissed as it does not meet the standards of Rule 9(b) and does not adequately plead reliance. The South Dakota Supreme Court has cited with approval the tort of negligent misrepresentation as it is described in the Restatement (Second) of Torts. *See O'Daniel v. Stroud NA*, 604 F. Supp. 2d 1260, 1263 (D.S.D. 2008).

> The tort of negligent misrepresentation occurs when in the course of a business or any other transaction in which an individual has a pecuniary interest, he or she supplies false information for the guidance of others in their business transactions,

> without exercising reasonable care in obtaining or communicating the information.

*Meyer v. Santema*, 559 N.W.2d 251, 254 (S.D. 1997) (quoting *Pickering v. Pickering*, 434 N.W.2d 758, 762 (S.D. 1989) (emphasis omitted) (citing Restatement (Second) of Torts § 552 (1977))).

> A party seeking relief for the tort of negligent misrepresentation must prove knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will . . . be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in good morals and good conscience the one has the right to rely upon the other for information and the other giving the information owes a duty to give it with care.

*Id.* (internal quotations omitted) (citing *Rumpza v. Larsen*, 551 N.W.2d 810, 814 (S.D. 1996)).

With respect to Management Defendants, Plaintiffs have pleaded sufficient facts demonstrating alleged misrepresentations attributed to each of the Management Defendants, made despite their alleged knowledge of facts to the contrary of their assertions and that Management Defendants owed Plaintiffs a duty of care due to Plaintiffs' membership in PAC. Plaintiffs allege that Defendant Newell participated in the fraud by "review[ing], approv[ing], and/or author[ing] the PPM and Due Diligence Report. Plaintiffs further pleaded that they relied on those statements in deciding to provide additional funds to support the Dauterive acquisition. Therefore, Plaintiffs have properly pleaded facts sufficient to support a plausible claim for relief for negligent misrepresentation against all Defendants and Defendants' Motions to Dismiss Count VII are denied.

## V.    State Law Fiduciary Duty Claim

Plaintiffs' final claim is that all Defendants owed Plaintiffs fiduciary duties pursuant to PAC's Operating Agreement and South Carolina law and that Defendants breached those fiduciary duties in two ways: 1) by making the false and misleading statements as alleged above in order to induce them to provide capital to fund the Dauterive acquisition; and 2) by soliciting their proxies and convincing them to vote in favor of filing for bankruptcy protection without providing "even the most basic information relevant to that filing" nor "a reasonable period of time to consider the filing." "Fiduciary duties of directors and shareholders are governed by the state of incorporation," in this case South Carolina. *Trooien v. Mansour*, 608 F.3d 1020, 1032 (8th Cir. 2010) (citing *Dunning v. Bush*, 536 F.3d 879, 886 (8th Cir. 2008)). Defendants do not

contest that they owe Plaintiffs fiduciary duties under S.C. Code Ann. § 33-44-409. However, Defendants argue that Plaintiffs have again failed to comply with the Rule 9(b) pleading standards which are required for breach of fiduciary duty claims sounding in fraud and that Defendants did not breach their fiduciary duties. Further, Defendants assert that dismissal is appropriate because Plaintiffs' breach of fiduciary duty claim regarding the bankruptcy vote "is merely a derivative action disguised as a direct action." Assuming Rule 9(b) does apply to breach of fiduciary claims involving fraud, the Court has already found that the heightened standards of the Private Securities Litigation Reform Act (PSLRA) and Rule 9(b) pleading standards have been met. Because this is the only reason Management Defendants provide as to why the breach of fiduciary duty claim with regard to the alleged misrepresentations prior to the Dauterive acquisition, the Court denies Management Defendants' motion to dismiss with regard to that specific claim. Similarly, because Plaintiffs have pleaded a plausible claim for fraud or misrepresentation against Defendant Newell, the allegation for breach of fiduciary duty with regard to alleged misrepresentations prior to the Dauterive acquisition survives Defendant Newell's motion to dismiss. The Court thus moves forward to address whether Plaintiffs have adequately pleaded facts which would give rise to a plausible claim for relief for breach of fiduciary duty with regard to the solicitation of their votes in favor of filing for bankruptcy.

"To establish a claim for breach of fiduciary duty, the plaintiff must prove: 1) the existence of a fiduciary duty, 2) a breach of that duty owed to the plaintiff by the defendant, and 3) damages proximately resulting from the wrongful conduct of the defendant." *RFT Management Co., L.L.C. v. Tinsley & Adams L.L.P.*, 732 S.E.2d 166, 173 (S.C. 2012). Under South Carolina law, a manager of a manager-managed LLC owes statutory duties of care, loyalty, and good faith and fair dealing not only to the company, but also to the company's other members. *See generally* S.C. Code. Ann. § 33-44-409. As such, S.C. Code Ann. § 33-44-410 allows a member of an LLC to maintain an action against the company or another member or manager for legal or equitable relief to enforce that member's rights under the operating agreement and under South Carolina law. That member, however, can only pursue that member's claim against the company or another member or manager. *See Hite v. Thomas & Howard Co.*, 409 S.E.2d 340, 342 (1991) (citations omitted), *overruled on other grounds by Huntley v. Young*, 462 S.E.2d 860, 861 (1995) ("A shareholder may maintain an individual action only if his loss is separate and distinct from that of the corporation. A shareholder's suit is derivative if the

gravamen of his complaint is an injury to the corporation and not the individual interest of the shareholder."); *Todd v. Zaldo*, 403 S.E.2d 666, 668 (S.C. Ct. App. 1991) ("If an individual shareholder has suffered a particular loss due to mismanagement of a corporation then the stockholder may bring an action for his loss since it is his personal asset. But, this loss must be personal and not a loss of the corporation."). To assert a claim on behalf of the company, the member must instead pursue a derivative claim pursuant to S.C. Code Ann. 33-44-1101.

Plaintiffs allege that Defendants breached their fiduciary duties to Plaintiffs by failing to provide basic information relevant to that filing and failing to give Plaintiffs a reasonable period of time to consider the filing. Plaintiffs allege that Defendants failed to advise Plaintiffs that authorizing the filing would require Plaintiffs to relinquish rights Plaintiffs held as members of PAC, including their right to bring derivative claims against Defendants. Finally, Plaintiffs allege that this breach caused a direct injury to the Plaintiffs by resulting in a loss of their entire PAC investment. The Court notes, however, that Plaintiffs only allege that Management Defendants were involved in the meetings and solicitation of votes regarding the bankruptcy filing. There is no mention of Defendant Newell's involvement.

Defendants argue that this is merely a derivative claim disguised as a direct claim. Defendants also argue that, though South Carolina courts have not directly considered whether a member's right to make an informed decision to vote on a company decision to file for bankruptcy gives rise to a direct or derivative claim, case law supports the notion that Plaintiffs' claim is a derivative one. The Court agrees.

In understanding the underlying reasons for requiring a derivative action, one may better understand the circumstances in which a member suffers a distinct injury from that of the LLC itself. The South Carolina Court of Appeals discussed the underlying reasons for the general rule that shareholders must file derivative actions for losses suffered by a corporation in *Brown v. Stewart*, 557 S.E.2d 676 (S.C. Ct. App. 2001). Those reasons include:

> 1) it prevents a multiplicity of lawsuits by shareholders; 2) it protects corporate creditors by putting the proceeds of the recovery back in the corporations; 3) it protects the interests of all shareholders by increasing the value of their shares, instead of allowing a recovery by one shareholder to prejudice the rights of others not a party to the suit; and 4) it adequately compensates the injured shareholder by increasing the value of his shares.

*Id.* at 685. (citing *Thomas v. Dickson*, 301 S.E.2d 49, 51 (Ga. 1983)). Those same reasons apply equally to the general rule that members must file derivative actions for losses suffered by a manager-managed LLC.

Plaintiffs' loss of their entire investment in PAC is not unique to Plaintiffs alone. Instead, it is a loss suffered by all members of PAC as a result of the bankruptcy filing and as such cannot be remedied in a direct action. Therefore, to bring a claim for breach of fiduciary duty for failure to inform the members of the consequences of their vote to file for bankruptcy, Plaintiffs must follow the procedural requirements of Rule 23.1 of the Federal Rules of Civil Procedure and state with particularity the efforts made, if any, by Plaintiffs to obtain the action they desire. Plaintiffs have not done so here. Thus, Plaintiffs have failed to state a plausible claim for relief and Defendants' motions to dismiss are granted with respect to the breach of fiduciary duty claim regarding the bankruptcy filing.

## CONCLUSION

Given the extent of the filings, much of which is not in the public domain, the Court probably should have converted these motions to dismiss into motions for summary judgment. However, there would have been no discovery at all. Nevertheless, there does not appear to be a need for extensive discovery in this case as the facts are pretty well-known. The Court anticipates setting a limited time for discovery and what is to be made of the facts will be for a jury to decide.

It appears that the actual investment loss to the Plaintiffs is slightly in excess of a million dollars. By the time this case goes through discovery, further motion practice, trial, and a likely appeal, the parties will leave having spent more than that in fees and expenses. In addition to that, there is always the unknown of what a jury might do. The Court says all of this even though this will be an interesting case for the Court to try to a jury, as the issues are interesting and the parties are well-represented. However, given the above considerations, the Court recommends, but does not order, early mediation. Judge Duffy, the Magistrate Judge for this Court, has had great success in mediation and, of course, private mediators are available. Accordingly,

IT IS ORDERED

1. Management Defendant's Motion to Dismiss, Doc. 26, is:
    a. GRANTED with respect to Counts IV and V;

b. GRANTED with respect to Count VIII to the extent it pertains to a failure to inform prior to the bankruptcy filing;

c. DENIED with respect to Counts I, II, III, VI, and VII.

d. DENIED with respect to Count VIII to the extent it pertains to the alleged misrepresentations leading to the investment funding the acquisition of Dauterive.

2. Defendant Newell's Motion to Dismiss, Doc. 28, is

a. GRANTED with respect to Counts II, IV, and V;

b. GRANTED with respect to Count VIII to the extent it pertains to a failure to inform prior to the bankruptcy filing;

c. DENIED with respect to Counts III, VI, and VII;

d. DENIED with respect to Count VIII to the extent it pertains to the alleged misrepresentations leading to the investment funding the acquisition of Dauterive.

Dated this 22nd day of March, 2018.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

BY: _Summer Wahpat_
DEPUTY